IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

RICHARD R. WATKINSON,

                        Plaintiff,

     vs.

STATE OF ALASKA, DEPARTMENT
OF CORRECTIONS; EARL HOUSER,
JAMES DUNCAN; and SCOTT DIAL,

                   Defendants.

Case No. 3:17-cv-00236-JMK

**MEMORANDUM OF DECISION**

# I.   INTRODUCTION

This matter came before the Court for bench trial, which commenced on November 9, 2020, and concluded with the parties submitting written closing arguments on November 13, 2020, and December 9, 2020, respectively.[1]   Plaintiff, Richard Watkinson, alleges Defendants State of Alaska Department of Corrections (Alaska DOC), Earl Houser,[2] James Duncan, and Scott Dial in their official capacities, violated his rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA)[3] and the First and Fourteenth Amendments of the United States Constitution.[4]

---

[1]  Dockets 92; 99.
[2]  The parties misspelled Mr. Houser's name on various pleadings.  In this Order, the Court uses the name listed on the State of Alaska Employee directory.
[3]  Docket 1 at 2–3.
[4]  *Id.*

## II. PROCEDURAL HISTORY

On November 8, 2017, Mr. Watkinson, an inmate incarcerated at the Goose Creek Correction Center (GCCC) in Wasilla, Alaska, filed a Complaint *pro se* against the Alaska DOC and five of its employees in their individual and official capacities alleging three causes of action.[5]

First, Mr. Watkinson alleged his constitutional First and Fourteenth Amendment rights were violated when Defendants "discriminat[ed] against the religion of Asatru"; "treat[ed] practitioners of the Asatru faith as if they were members of an STG group[6] based solely upon their race and religious preference . . . [and] retaliat[ed] against Plaintiff and Asatru practitioners for pursuing fair treatment and their religious rights . . . ."[7] Second, Mr. Watkinson alleged his constitutional First and Fourteenth Amendment rights were violated when Defendants: (1) engaged in "discriminatory and biased practices that discourage[d] prisoners from the practice of Asatru, while encouraging the practice of other religions"; (2) "subject[ed] practitioners of the Asatru faith to treatment not leveled at other religious practices"; (3) "den[ied] a benefit to Asatru practitioners that is afforded to other prisoners and/or religious practices"; and (4) "creat[ed] a negative environment that places Asatru practitioners under emotional distress . . . ."[8] Third, Mr. Watkinson alleged Defendants "placed a substantial burden upon Plaintiff['s] religious practice" in

---

[5] Mr. Watkinson's Complaint named as Defendants: John Conant, the Superintendent of GCCC "at all times relevant"; "Earl Hauser," who is Earl Houser, the "current" Superintendent; James Duncan, Chaplaincy Coordinator for the Alaska DOC; Scott Dial, a correctional officer of the Alaska DOC; and Keith Rogers, a correctional officer of the Alaska DOC. *Id.* at 1–3.

[6] STG refers to a "Security Threat Group." *Id.* at 4.

[7] *Id.* at 17–18.

[8] *Id.* at 18–19.

violation of RLUIPA by: (1) "unnecessarily separating Asatru practitioners from their consecrated religious items"; (2) preventing Plaintiff and other Asatru practitioners from observing "religious High Feasts"; (3) "preventing Asatru practitioners access and utilization of the Prisoner Welfare Fund in support of [] religious practice"; and (3) "forcing Plaintiff and Asatru practitioners to pay exorbitant prices for all natural juice from the facility commissary."[9] Mr. Watkinson requested various declaratory and injunctive relief, punitive damages in the amount of $50,000 against each named defendant, and costs.[10]

On December 5, 2017, Howard Walton Anderson, III, entered an appearance on behalf of Mr. Watkinson.[11] Alaska DOC filed an Answer to Mr. Watkinson's Complaint on June 18, 2018; Defendants Conant, Dial, Duncan, Houser, and Rogers filed an Answer on October 22, 2018.[12] On March 29, 2019, the Court dismissed, as per the parties' stipulation, "all claims against Defendants John Cogant [sic] and Keith Rogers" without prejudice, "all claims against Defendant State of Alaska—except those relating to the Prisoner Welfare Fund under 42 U.S.C. 2000cc et seq and/or for declaratory and injunctive relief" without prejudice, and "all claims against Defendants Earl Hauser [sic], Scott Dial, James Duncan, and Keith Rogers—except those relating to the Prisoner Welfare Fund," without prejudice.[13]

---

[9] *Id.* at 19–20.
[10] *Id.* at 21–22.
[11] Docket 7.
[12] Dockets 14; 24.
[13] Dockets 29; 30. It appears that the parties only meant to preserve claims against Defendants Houser, Dial, and Duncan, and mistakenly included Rogers in this list. *See* Docket 68 at 1 (Joint Statement of Issues) (listing Earl Houser, James Duncan, and Scott Dial as the remaining defendants).

On January 22, 2020, Mr. Watkinson moved to withdraw his prayer for damages, and the Court granted his request for leave to pursue only declaratory and injunctive relief against Defendants, as well as costs and fees.[14] His demand for a jury trial was withdrawn.[15] Mr. Watkinson now specifically requests that this Court declare: (1) "[t]he Defendants violated his RLUIPA, First Amendment, and Equal Protection Rights, in that they have unlawfully deprived him of the right to compete for PWF funds to purchase firewood and food/beverage products"; (2) that "DOC Policy and Procedure § 302.10, Paragraph III and/or Policy & Procedure 815.03 Paragraph (V)(A)-(C) are illegal insofar as they categorically exclude religious organizations from being eligible to obtain PWF funds"; and (3) "Mr. Watkinson and other religious practitioners can individually or collectively donate funds to reimburse the PWF for purchases that would not otherwise have sufficiently broad appeal to merit PWF purchase without inmate reimbursement, subject to the Superintendent's ability to deny particular requests for religiously neutral reasons."[16]

"Mr. Watkinson also requests that the Court order the Defendants: (1) [t]o cease discrimination against religion in general and Asatru in particular with respect to the PWF; and (2) [t]o develop criteria independent of religion for evaluating PWF funding requests within 45 days of the entry of judgment."[17]

---

[14] Dockets 59; 62.
[15] Docket 80 at 2.
[16] Docket 92 at 14.
[17] *Id.* at 14–15.

*Watkinson v. State of Alaska, Dept. of Corrections et al*  Case No. 3:17-cv-00236-JMK
Memorandum of Decision  Page 4

Case 3:17-cv-00236-JMK Document 102 Filed 12/31/20 Page 4 of 27

## III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Federal Rule of Civil Procedure 52(a) provides that "in an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Having considered the testimony of the witnesses, the exhibits admitted into evidence, and the parties' arguments and filings, this Court now makes the Findings of Fact and Conclusions of Law as set forth below.[18]

### A. Findings of Fact

**1. The Parties.** Mr. Watkinson is a prisoner of the Alaska DOC and is incarcerated at GCCC.[19] Alaska DOC is a state agency charged with the care of prisoners and is subject to RLUIPA. Defendant Houser is the Superintendent of GCCC, where Lieutenant Dial is a correctional officer.[20] Defendant Duncan is the Chaplaincy Coordinator for Alaska DOC.[21]

**2. The Asatru Faith.** Mr. Watkinson is a practitioner of Asatru, a recognized faith group within the Alaska DOC, and belongs to a congregation known as the Blodtryggr Kindred.[22] Asatru is a polytheistic religion with roots in ancient Scandinavia, and followers worship deities such as Thor, Odin, and Freya.[23] The Court finds the testimony of Mr. Watkinson to be credible.

---

[18] This Memorandum of Decision does not purport to recite all of the evidence submitted and arguments made by the parties. *See* Fed. R. Civ. P. 52(a) Advisory Committee's Note (1946 Amendment). ("[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.").

[19] Docket 80 at 3.

[20] *Id.*

[21] *Id.*

[22] *Id.* at 3–4.

[23] *Id.* at 4.

3. **Religious Items.** Firewood is used by Asatru practitioners during a weekly ceremony known as a blot.[24] During the blot, a fire is built, which has spiritual and religious significance to Asatru practitioners.[25] Three drinking rounds are held using juice and honey to simulate mead, and worshipers speak in honor of certain gods, goddesses, or heroes.[26]

4. **The Prisoner Welfare Fund (PWF).** Alaska DOC administers the PWF at GCCC in accordance with DOC policy 302.10 ("Prisoner Welfare Fund"). The PWF is "[a] fund established at an institution in order to provide loans or grants to prisoners or prisoner organizations for activities not funded by general appropriations from the Department."[27] The PWF may only be used for "charitable, recreational and educational purposes when approved and authorized in writing by the Superintendent or their designee."[28] Cultural groups and non-religious groups are able to submit requests to utilize funds from the PWF, but they are not guaranteed to receive what they request.[29] Religious groups are not able to obtain funding from the PWF.[30] The PWF is funded by a three percent (3%) surcharge on most commissary items.[31]

---

[24] Docket 93 at 20.
[25] *Id.*
[26] *Id.* at 20, 24–25.
[27] Docket 69-1 at 1 ("It is the policy of the Department that money in the Prisoner Welfare Fund will be used to the benefit of the prisoners or prisoner organization for activities not funded by the Department through general appropriations.").
[28] *Id.* at 2.
[29] Docket 93 at 51–52.
[30] *Id.* at 51.
[31] Docket 80 at 4.

*Watkinson v. State of Alaska, Dept. of Corrections et al*                                    Case No. 3:17-cv-00236-JMK
Memorandum of Decision                                                                              Page 6
Case 3:17-cv-00236-JMK   Document 102   Filed 12/31/20   Page 6 of 27

**5.    Faith Group Property Policy.**  DOC policy 816.01 ("Faith-Based Programming and Chaplaincy Services") provides that "[t]he Department is not responsible for the procurement of any faith group property or equipment."[32]

**6.    Access to the PWF.**  Prior to a reevaluation of Alaska DOC's policy in May 2017 (discussed *infra*), Mr. Watkinson was able to donate money from his Offender Trust Account ("OTA") to the PWF, which would be held for the benefit of the Asatru faith group.[33]  Asatru members could pool their money together and access the fund to the purchase firewood, juice, and honey for their worship.  This allowed the Asatru faith group to circumvent the prison commissary, where the items otherwise are available.  Items are subject to a mark-up in price if purchased through the commissary.[34]

**7.    Alaska DOC's Reevaluation of the PWF Policy.**  In February 2017, Defendant Duncan sent an email to Keith Rogers (a correctional officer) agreeing with Mr. Rogers' analysis that the PWF should not be used to purchase firewood.[35] Subsequently, Defendant Dial announced that the Alaska DOC had reevaluated its policy with respect to the PWF and determined that it would no longer allow the Asatru faith group to obtain firewood purchased with funds from the PWF.[36]  Mr. Watkinson filed grievances, but was unsuccessful in reversing the prison's new application of its policy.[37]

---

[32] Docket 69-12 at 5.
[33] Docket 80 at 6.
[34] Dockets 80 at 7; 88 at 4.
[35] Docket 69-7.
[36] Dockets 80 at 7; 69-8.
[37] Dockets 69-4; 69-5; 69-10; 69-13.

*Watkinson v. State of Alaska, Dept. of Corrections et al*      Case No. 3:17-cv-00236-JMK
Memorandum of Decision                                          Page 7
Case 3:17-cv-00236-JMK   Document 102   Filed 12/31/20   Page 7 of 27

**8. Burden on Religious Exercise.** Mr. Watkinson testified that the new interpretation of Alaska DOC's policy subjected him to increased personal expense, delay, and uncertainty in obtaining firewood, juice, and honey, as he is no longer able to utilize the PWF to obtain these items.[38] He testified there were times when he was not able to obtain the items because the Asatru faith group did not have the "financial accommodations" to be able to buy enough, or the families of members were unable to donate items or funds in time for the ceremony.[39] Defendants did not present any evidence to refute this testimony.

**9. Obtaining Firewood, Honey, and Juice Through Other Means.** Mr. Watkinson testified he was able to purchase juice and honey through the prison commissary,[40] and that Asatru practitioners were able to facilitate arrangements for their families to purchase items and have a vendor deliver to the prison.[41] Prison officials encouraged Mr. Watkinson to seek assistance from the wider Asatru faith community for donated goods.[42] Again, the Court finds this testimony credible.

**10. Concerns About Fraud.** Jeremy Hough, Director of Institutions for the Alaska DOC, testified that Department of Administration and bank rules both prohibit the Alaska DOC from creating individual accounts for groups within the PWF.[43] He testified that Alaska DOC has contacted banks about setting up separate accounts, which

---

[38] Docket 93 at 26–28.
[39] *Id.* at 27.
[40] *Id.* at 26–27.
[41] *Id.*
[42] Docket 69-13.
[43] Docket 93 at 41.

*Watkinson v. State of Alaska, Dept. of Corrections et al*       Case No. 3:17-cv-00236-JMK
Memorandum of Decision                                            Page 8
Case 3:17-cv-00236-JMK   Document 102   Filed 12/31/20   Page 8 of 27

have denied the permission required to do so.[44]  These institutions are concerned about "possible fraud," and other criminal activity achieved through "strong-arming" "that can go on under the guise of a club, organization, or religious practice."[45]  The Court found the testimony of Mr. Hough to be credible.

      **11.**    **Virtual Balance.**  According to Mr. Hough, no other religious or cultural group maintained or maintains a virtual balance within the PWF at GCCC.[46]  Plaintiff did not present any evidence to the contrary.

      **12.**    **Legal Concerns.**  Mr. Hough stated it is his understanding that it is "not legal" to allow religious groups to use the PWF to purchase religious items.[47]  Alaska DOC cited to concerns about constitutional establishment clause violations.[48]

      **13.**    **Administrative Efficiency and Fairness.**  Mr. Hough testified that it is "not feasibly administratively possible" to distribute PWF funds to religious groups in a way that gives each group its "fair share," due to the diversity of the inmate population.[49]  He further testified that if Alaska DOC were to make PWF funds available for religious purposes, "the fund would wind up being a hundred percent [consumed by religious endeavors] because that's where the push would be,"[50] which would run counter to its goals of providing recreational and educational activities for the benefit of the entire prisoner

---

[44] *Id.* at 49.
[45] *Id.* at 48.
[46] *Id.* at 34.
[47] *Id.* at 42.  The Court interprets Mr. Hough's testimony as a statement of Alaska DOC's policy and belief, rather than a legal conclusion.
[48] *Id.* at 14.
[49] *Id.* at 40, 42.
[50] *Id.* at 43.

population. Plaintiff presented no evidence to the contrary, and the Court finds this testimony to be credible.

14. **The Hiland Mountain Group.** A prisoner organization at the "Hiland Mountain" facility maintains its own account through the PWF.[51] The group facilitates a greenhouse project and sells plants.[52] According to Mr. Hough, the Department of Administration and banking institutions allow this group to continue maintaining its own balance due to the longstanding nature of the program.[53] Plaintiffs do not refute this assertion.

15. **The Sweat Lodge.** The PWF is drawn upon to purchase firewood for a sweat lodge at GCCC.[54] The sweat lodge is accessible to all inmates; however, Mr. Watkinson testified it is run in a "Lakota Sioux way," in which there are several rounds of prayer.[55] Defendants presented no evidence to the contrary, and the Court found this testimony to be credible. Further, the sweat lodge is operated by a Native American cultural group that is separate from the Native American religious groups at GCCC.[56] Mr. Watkinson has **attended** the sweat lodge at GCCC close to a dozen times.[57]

---

[51] *Id.* at 48.
[52] *Id.*
[53] *Id.* at 49.
[54] Dockets 80 at 5; 88 at 2.
[55] Docket 93 at 19, 43. According to Mr. Hough, "[n]o preference is given to any particular offender, nor is it denoted as to their religious affiliation." *Id.* at 43. Plaintiff did not refute this assertion.
[56] *Id.* at 63–64.
[57] *Id.* at 19.

**B.     Conclusions of Law**

**1.     Federal Substantive Law Applies.**   The Court applies federal substantive and procedural law.

**2.     Standard of Review.**   "[T]he decision to grant declaratory relief is a matter of discretion[.]"[58]

**3.     The Religious Land Use and Institutionalized Persons Act (RLUIPA).**  RLUIPA "prescribes that no government shall impose a substantial burden on the religious exercise of prisoners unless the government can demonstrate that the burden both serves a compelling government interest and is the least restrictive means of advancing that interest."[59]  "Religious exercise" under RUILPA includes "any exercise of religion, whether or not compelled by, or central to, a religious belief."[60]  "Government," under RLUIPA, includes a "person acting under color of State law."[61]

**4.     RLUIPA is Applicable.**   Here, both parties agree that RLUIPA applies to Alaska DOC's actions because the agency receives federal financial assistance.[62]

**5.     Mr. Watkinson's Beliefs are Religious and Sincere.**   It is undisputed that Mr. Watkinson is a member of a bona fide religion and sincere in his beliefs.  The parties agree that the blot ceremonies described by Mr. Watkinson, which

---

[58] *United States v. State of Wash.*, 759 F.2d 1353, 1356 (9th Cir. 1985).
[59] *Mayweathers v. Newland*, 314 F.3d 1062, 1065 (9th Cir. 2002) (citing to 42 U.S.C. § 2000cc-1(a) (2000)) (internal quotation marks omitted)).
[60] *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) (citing to § 2000cc-5(7)(A)).
[61] *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 921–22 (9th Cir. 2011) (citing 42 U.S.C. § 2000cc-5(4)(A)(iii)).
[62] 42 U.S.C. §§ 2000cc(b)(1); Dockets 80 at 9; 88 at 5.

*Watkinson v. State of Alaska, Dept. of Corrections et al*                    Case No. 3:17-cv-00236-JMK
Memorandum of Decision                                                                        Page 11
Case 3:17-cv-00236-JMK   Document 102   Filed 12/31/20   Page 11 of 27

involve the use of firewood and drinking of juice and honey, constitute a religious exercise of Asatru in accordance with RLUIPA.[63]

**6. Mr. Watkinson Bears of Burden of Proving Defendants Substantially Burdened His Religious Exercise.** Mr. Watkinson bears the burden of showing Defendants imposed a substantial burden on his religious exercise.[64] RLUIPA does not specifically define what constitutes a "substantial burden"; however, the Ninth Circuit has described the burden as one that "must impose a *significantly* great restriction or onus upon such exercise."[65] A substantial burden "must place more than an inconvenience on religious exercise,"[66] and the Supreme Court has found a substantial burden where the state's conduct creates "substantial pressure on an adherent to modify his behavior and to violate his beliefs."[67] Although "compulsion may be indirect,"[68] RLUIPA "does not impose affirmative duties on states that would require them to facilitate or subsidize the exercise of religion."[69] The statute must be construed broadly in favor of protecting an inmate's right to exercise his or her religious beliefs.[70]

Mr. Watkinson's fundamental argument is that Defendants have substantially burdened his practice of Asatru by no longer affording him the benefit of

---

[63] *See Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) ("The exercise of religion often involves not only belief and profession but the performance of physical acts such as assembling with others for a worship service or participating in sacramental use of bread and wine.") (internal quotations omitted).
[64] *Warsoldier*, 481 F.3d at 994.
[65] *Id.* at 995 (emphasis added).
[66] *Guru Nanak Sikh Soc. of Yuba City v. Cty of Sutter*, 456 F.3d 978, 987 (9th Cir. 2006).
[67] *Warsolider*, 418 F.3d at 995 (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981)).
[68] *Warsolider*, 418 F.3d at 995.
[69] *Mayweathers v. Newland*, 314 F.3d at 1068–69.
[70] *Warsoldier*, 418 F.3d at 995.

accessing monies from the PWF for the purchase of juice and honey at a discounted rate, or for the purchase of firewood that the facility already obtains. Defendants assert that the failure to subsidize Mr. Watkinson's religious celebrations cannot be construed as a substantial burden on his ability to practice Asatru. The Court agrees with Defendants.

7. **RLUIPA Does Not Demand the State Pay for or Subsidize Items of Worship.** RLUIPA explicitly denies creating a right for religious organizations to receive funding from the government.[71] As Defendants state in their closing brief, the Supreme Court has held that "[d]irected at *obstructions* institutional arrangements place on religious observances, RLUIPA does not require a State to pay for an inmate's devotional accessories."[72] Simply put, affirmative subsidization of religious activities is not mandated under RLUIPA. The fact that Asatru practitioners previously benefitted from access to the PWF, or the fact that other cultural groups benefit from the administration of the fund, is not evidence of a substantial burden on Mr. Watkinson's religious practice. Indeed, other courts have found that "a prison's voluntary decision to exceed RLUIPA's requirements should not subject it to further RLUIPA liability."[73]

---

[71] *See* 42 U.S.C. § 2000cc-3(c) ("Nothing in this chapter shall create . . . a right of any religious organization to receive funding or other assistance from a government, or of any person to receive government funding for a religious activity, but this chapter may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise.").

[72] *Cutter*, 544 U.S. at 720 n.8 (citing *Charles v. Verhagen*, 348 F.3d 601, 605 (7th Cir. 2003) (overturning a prison prohibition on the possession of Islamic prayer oil but placing the responsibility for purchasing the oil on the prisoner)) (emphasis added)).

[73] *Knows His Gun v. Montana*, 866 F. Supp. 2d 1235, 1241 (D. Mont. 2012) ("Plaintiffs' claims concerning inadequate or inappropriate materials that are provided by the prison—including wood, tarps, and tobacco—fail because RLUIPA does not require prisons 'to pay for an inmate's devotional accessories.'") (citing *Cutter*, 544 U.S. at 720 n.8).

**8. Defendants Have Not Substantially Burdened Mr. Watkinson's Religious Practice.** Importantly, the evidence introduced at trial did not show that Defendants have, in any way, "deni[ed] [Plaintiff an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on [him] to modify his behavior and to violate his beliefs."[74] Mr. Watkinson still may purchase juice and honey from the prison commissary, or arrange for family members to purchase the juice and a vendor to deliver it to the prison.[75] Mr. Watkinson also testified that GCCC allows family members to deliver firewood for the blots, and that he was encouraged by prison officials to "request reasonable alternatives to obtain it."[76] Indeed, Mr. Watkinson still can avail himself of the PWF funds for secular purposes, and testified that he does just that by attending the sweat lodge and utilizing the firewood purchased by the PWF for that purpose.[77] The Court cannot find that Mr. Watkinson faces a substantial burden under RLUIPA when he is not meaningfully obstructed from or penalized by practicing his sincerely held religious beliefs. He, thus, has not established a violation of RLUIPA.[78]

**9. Defendants Bear the Burden of Showing a Compelling Governmental Interest.** Assuming, *arguendo*, Mr. Watkinson could produce evidence of a substantial burden on his practice of Asatru, the Court still would find that Defendants have met their burden to then show Alaska DOC's policies are the least restrictive means

---

[74] *Warsoldier,* 418 F.3d at 995 (citing *Thomas,* 450 U.S. at 717–18).
[75] Docket 93 at 27.
[76] Dockets 93 at 24; 69-5 at 1.
[77] Docket 93 at 19.
[78] *See Riggins v. Clarke,* 403 Fed. Appx. 292, 295 (9th Cir. 2010) (finding State corrections officials' refusal to allow prisoner to purchase prayer oils did not violate his right to exercise his religion under RLUIPA).

*Watkinson v. State of Alaska, Dept. of Corrections et al*    Case No. 3:17-cv-00236-JMK
Memorandum of Decision    Page 14
Case 3:17-cv-00236-JMK    Document 102    Filed 12/31/20    Page 14 of 27

of furthering compelling governmental interests. Defendants advance four compelling interests. First, "DOC has a compelling governmental interest in not treating various religious groups unequally or unfairly, both as a matter of justice and in order to avoid fomenting interreligious strife."[79] Second, "DOC has a compelling governmental interest in funding 'charitable, recreational and educational' activities among the prison population through PWF."[80] Third, Defendants identified an interest "in not intermingling the funds of particular religious groups with those designated for other purposes, for reasons of administrative efficiency and to prevent fraud."[81] Fourth, Defendants allude to establishment clause concerns with supporting religious activities by using intermingled state funds.[82] Defendants assert that requiring religious groups to separately purchase items intended for their group's religious practice is the least restrictive means of furthering those governmental interests.[83]

The Ninth Circuit has found compelling government interests in prison security[84] and in complying with the Constitution.[85] The Supreme Court has acknowledged that RLUIPA's standard of review should be applied with "due deference to the experience and expertise of prison and jail administrators in establishing the necessary regulations and

---

[79] Docket 99 at 11.
[80] *Id.*
[81] Docket 88 at 6.
[82] Docket 93 at 14.
[83] Docket 88 at 6.
[84] *See Warsoldier,* 418 F.3d at 998.
[85] *See Walker v. Beard,* 789 F.3d 1125, 1136 (9th Cir. 2015) ("Compliance with the Constitution can be a compelling state interest.").

procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."[86]

**10. Complying with the Constitution is a Compelling Governmental Interest.** The Court finds that the government's interest in ensuring it does not violate the Constitution's establishment clause by institutionally supporting religious activities of the Asatru faith group is compelling. The Court need not assess the exact probability of success of a constitutional claim, but is satisfied that "the State has shown more than merely a good faith belief" that Mr. Watkinson's request may run afoul of the establishment clause of the Constitution and there is an objective legal basis for believing that is the case.[87]

**11. Maintaining Security is a Compelling Governmental Interest.** The Court further recognizes the Defendants' interest in preventing the illegal criminal activity (fraud, strong-arming, debt payoff) described by Mr. Hough. Alaska DOC's

---

[86] *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (quoting S. Rep. No. 103-111, at 10 (1993)).

[87] *Walker v. Beard*, 789 F.3d 1125, 1137 (9th Cir. 2015). Mr. Watkinson cites to *Everson v. Bd. Of Educ.*, 330 U.S. 1, 17 (1947) and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017), for the proposition that providing funding to religious institutions on the same terms as secular institutions does not violate the establishment clause. *See* Docket 92 at 8–9. In *Everson*, the Supreme Court upheld the right of a New Jersey school board to fund the transportation of pupils to both public and parochial schools. The Supreme Court found that the resolution provided a "general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." *Everson*, 330 U.S. at 18. In *Trinity Lutheran Church*, the Supreme Court held that a church had the right to compete with other secular organizations for a playground resurfacing grant. *Trinity Lutheran Church of Columbia, Inc.*, 137 S. Ct. at 2025. Both cases are inapplicable here because Mr. Watkinson is seeking to use the PWF funds to support his religious exercise. The Ninth Circuit has found that "a government act is consistent with the establishment clause if it: (1) has a secular purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion; and (3) does not foster excessive governmental entanglement with religion." *Vasquez v. Los Angeles ("LA") County*, 487 F.3d 1246, 1255 (9th Cir. 2007) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (9th Cir. 1971)). Although the Court makes no assessment of the validity of such a constitutional claim, it does recognize that Alaska DOC's hesitancy to utilize its funds to directly advance Mr. Watkinson's religious exercise is not without merit.

interest is compelling because it poses a threat to institutional security, as does preventing interreligious strife that may be stoked by showing favoritism to certain groups over others.

  **12.**  **Least Restrictive Means.**  The Court also would be able to find that prohibiting the Asatru faith group from maintaining a virtual balance within the PWF is the least-restrictive means of achieving Defendants' compelling governmental interests. "The least-restrictive-means standard is exceptionally demanding,"[88] but the government "is under no obligation to dream up alternatives that the plaintiff himself has not proposed."[89]  Here, Mr. Watkinson proposed no alternatives to utilizing the PWF to purchase religious items. Mr. Hough testified it was effectively impossible, due to the rules of the banks and the State of Alaska's Department of Administration, for the Asatru faith group to continue to maintain a virtual balance. When doing so could expose the institution to constitutional liability and security concerns, maintaining such a policy is the least-restrictive option available to continuing to operate the PWF. The Court thus concludes Alaska DOC's actions were the least restrictive means of furthering their compelling governmental interests.

  **13.**  **First Amendment Free Exercise Clause.**  "Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion,'" and an inmate who adheres to a minority religion must be given a "reasonable opportunity of pursuing his faith comparable to the

---

[88] *Holt v. Hobbs*, 574 U.S. 352, 364 (2015).
[89] *Walker*, 789 F.3d at 1137.

*Watkinson v. State of Alaska, Dept. of Corrections et al*        Case No. 3:17-cv-00236-JMK
Memorandum of Decision                 Page 17

Case 3:17-cv-00236-JMK   Document 102   Filed 12/31/20   Page 17 of 27

opportunity afforded fellow prisoners who adhere to conventional religious precepts."[90] However, "reasonable opportunities" does not mean identical treatment.[91] "In order to establish a free exercise violation, [Plaintiff] must show the defendants burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests."[92] Only those beliefs which are rooted in religion and sincerely held are entitled to constitutional protection.

      **14.    Mr. Watkinson Has Not Proven His Religious Practice Was or Is Burdened.** As discussed *supra*, the Court cannot find that Defendants substantially burdened Mr. Watkinson's practice of the Asatru faith. The Court finds that while Defendants' failure to administer the PWF in a way that subsidizes firewood, juice, and honey may be inconvenient to Mr. Watkinson, it does not amount to a prohibition on his ability to practice his religion or a punishment for doing so.[93]

      **15.    Defendants Bear the Burden of Showing Their Policies Are Reasonably Related to Legitimate Penological Interests.** Assuming, *arguendo*, Mr. Watkinson was able to show that the additional expense and logistical challenge of

---

[90] *See Shakur v. Schriro*, 514 F.3d 878, 883–84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)); *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam).

[91] *Cruz*, 405 U.S. at 322 n.2.

[92] *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997) (abrogated on other grounds by *Shakur*, 514 F.3d 878) (internal citations omitted); *see also Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of her religion.").

[93] *See Lewis v. Ollison*, 571 F. Supp. 2d 1162, 1171 (C.D. Cal. 2008) ("The First Amendment does not prohibit a prisoner from being inconvenienced in practicing his faith so long as the penological practices do not prevent or prohibit the inmate from participating in the practice or mandates of his religion.").

obtaining firewood, juice, and honey constituted a substantial burden on his religious exercise, the Court still finds that Alaska DOC's policy with respect to the PWF is reasonably related to a legitimate penological interest. The Ninth Circuit follows the four-part test formulated by the Supreme Court in *Turner v. Safley*[94] in determining the reasonableness of a prison regulation affecting constitutional rights.[95]

16. ***Turner* Factors.** First, there must be "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."[96] The "legitimate governmental interest" at stake here is the fair and equitable administration of the PWF. Prohibiting religious organizations from utilizing the PWF for purely religious activities is rationally related to this interest. Mr. Hough testified that if the Alaska DOC allowed the PWF to fund religious activities it would effectively end the use of the fund for its intended purpose: funding activities for all inmates to enjoy regardless of religious affiliation.[97] The first *Turner* factor is thus satisfied.

The second factor the Court turns to in determining the reasonableness of a prison regulation under *Turner* is "whether there are alternative means of exercising the right that remain open to prison inmates."[98] As discussed *supra*, Mr. Watkinson still may obtain juice, honey, and firewood without accessing the PWF. Although the Court need not find there are alternative means to practicing the exact religious right Mr. Watkinson

---

[94] *See generally Turner v. Safley*, 482 U.S. 78 (1987).
[95] *Resnick v. Adams*, 348 F.3d 763, 768–770 (9th Cir. 2003).
[96] *Id.* at 769.
[97] Docket 93 at 42–43.
[98] *Resnick*, 348 F.3d at 769.

claims has been burdened,[99] in this case, it can find exactly that. Mr. Watkinson testified that even after the Asatru group was prohibited from using PWF funds to obtain firewood, they continued to conduct blot ceremonies when members' families assisted in securing firewood and juice.[100] This factor thus weighs in favor of Defendants.

Third, under *Turner*, the Court considers "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."[101] The Court also may consider whether "special arrangements for one group could create an appearance of favoritism that could generate resentment and unrest," although this consideration alone may not be dispositive, because such appearance will be present in every case where accommodations are made.[102] The accommodation Mr. Watkinson seeks is an exemption from Alaska DOC's policy that it is not responsible for the procurement of faith group property. Exempting the Asatru faith group from this general rule would be unfair to other religious groups that are unable to take advantage of the PWF to fund their activities, as well as to the general inmate population that benefits from the secular activities the fund is intended to sponsor. Defendants point out that allowing one group (or several) to maintain a virtual balance could result in such resentment and unrest contemplated by courts, or in the elimination of the PWF altogether. Mr. Hough also identified the possibility of fraud and other criminal

---

[99]  *See O'Lone*, 482 U.S. at 352 ("In *Turner*, we did not look to see whether prisoners had other means of communicating with fellow inmates, but instead examined whether the inmates were deprived of 'all means of expression.'").

[100]  Docket 93 at 23–24, 27.

[101]  *Turner*, 482 U.S. at 90.

[102]  *Standing Deer v. Carlson*, 831 F.2d 1525, 1529 (9th Cir. 1987); *see Henderson v. Terhune*, 379 F.3d 709, 714 (9th Cir. 2004).

activity that can go on when individual groups are allowed to maintain separate virtual balances.  It is of no consequence that Defendants produced no evidence of actual fraud that has occurred.[103]  Taken together, these considerations cut in favor of prison officials.

The fourth and final *Turner* factor is the availability of "obvious, easy alternatives."[104]  An obvious alternative to prohibiting Asatru practitioners from maintaining a virtual PWF balance that allows Alaska DOC to administer the fund in an equitable manner, is allowing each recognized religious group to maintain its own virtual PWF balance.  However, the evidence shows that this alternative is not "easy."  Mr. Hough testified that it would be "extremely hard" to allocate funds in a way that would give each **religious** organization its "fair share."[105]  Indeed, the Sixth Circuit has found that

> [r]equiring prisons to maintain comprehensive records as to the religious composition of their populations and to allocate resources for religious activities accordingly would undoubtedly spark countless claims by various groups that they were not receiving their fair share.  Moreover, predicating resource allocation on such an elusive standard as the numbers of regularly practicing inmates would compel prison officials and courts to scrutinize the consistency of individual inmates' religious practices and to decide controversies regarding the precise contours of the various competing religious groups.  Furthermore, the constant turnover of prison populations would render wholly impracticable any attempt to require that the religious resources allocation scheme conform exactly to the denominational distribution present in a prison at any given time.  Adoption of plaintiffs' position would, therefore, embroil the prisons and courts in dangerous and inappropriate

---

[103] *See Friedman v. State of Ariz.*, 912 F.2d 328, 332–33 (9th Cir. 1990) ("*Turner* requires that courts allow prison officials 'to *anticipate* security problems and to adopt innovative solutions to the intractable problems of prison administration.'") (citing *Turner*, 482 U.S. at 89) (emphasis in original).

[104] *Turner*, 482 U.S. at 90.

[105] Docket 93 at 42.

*Watkinson v. State of Alaska, Dept. of Corrections et al*  Case No. 3:17-cv-00236-JMK
Memorandum of Decision  Page 21
Case 3:17-cv-00236-JMK   Document 102   Filed 12/31/20   Page 21 of 27

areas of inquiry and would prove exceedingly difficult to implement in an orderly and even handed fashion.[106]

The Court finds this reasoning persuasive. It is not reasonable to suggest that prison officials take responsibility for the bookkeeping of every religious organization within its walls so that it may administer a fund—it has no obligation to administer at all—in a fair and even-handed manner. Further, Mr. Hough testified that, from a purely administerial standpoint, the banking institutions utilized by the prison system no longer allow the PWF to contain line items for specific organizations, or the pooling of OTA funds, as Mr. Watkinson requests.[107] It is administratively burdensome, and in some ways impossible, to fashion an alternative to Alaska DOC's religious property procurement policy that still achieves its interests with regard to administering the PWF. Each of the *Turner* factors weighs in favor of Defendants. Alaska DOC's policies reasonably are related to a legitimate penological interest and cannot be said to abridge Mr. Watkinson's First Amendment rights.

**17. Fourteenth Amendment Equal Protection Clause.** "The Constitution's equal protection guarantee ensures that prison officials cannot discriminate against particular religions."[108] "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon

---

[106] *See Thompson v. Com. of Ky.*, 712 F.2d 1078, 1081 (6th Cir. 1983).
[107] Docket 93 at 40.
[108] *Freeman*, 125 F.3d at 737.

membership in a protected class."[109]  Again, Mr. Watkinson cannot succeed "if the difference between the defendants' treatment of him and their treatment of [] inmates [of a different religion] is reasonably related to legitimate penological interests."[110]

      **18.   Intentional Discrimination.** The sweat lodge at GCCC, run by a Native American cultural group, is permitted to use firewood obtained through the PWF, while the Asatru faith group is prohibited from maintaining a virtual balance within the PWF to purchase firewood for blot ceremonies.[111]  Mr. Watkinson argues that the Asatru faith group is treated differently from the Native American cultural group and the Hiland Mountain cultural group at another prison, which is able to maintain a virtual balance in the PWF.[112]

        Mr. Watkinson has not put forth any evidence of intentional discrimination. Although discriminatory intent may be inferred from disparate treatment, Mr. Watkinson has not alleged that he has been treated differently from any other religious group.  The Court recognizes that the differences in classification between what constitutes a "religious" group as opposed to a "cultural" one, according to Alaska DOC policy, are susceptible to a certain degree of subjectivity.  However, absent evidence of ill-intent or abject arbitrariness, it is improper—and indeed inappropriate—for the Court to interfere with Alaska DOC's classifications.  In this case, it must defer to prison officials'

---

    [109] *Furnace v. Sullivan*, 705 F.3d 1021, 1030 (9th Cir. 2013) (quotation marks and citation omitted) (rejected equal protection claim where inmate failed to show that he was treated differently than any other inmates in the relevant class).
    [110] *Shakur*, 514 F.3d at 891(internal citations and quotation marks omitted).
    [111] Docket 92 at 12.
    [112] *Id.* at 13.

assessment of the sweat lodge as a cultural activity and the Native American group that administers the sweat lodge as cultural.[113]

However, even if the Court were to find that the Native American cultural group principally was religious in nature, it notes that "[p]risons need not provide identical facilities . . . to different faiths, but must make good faith accommodation of the [prisoners'] rights in light of practical considerations."[114] Again, it appears from the record that prison officials made reasonable accommodations to ensure that Asatru practitioners could continue conducting blot ceremonies. As discussed *supra*, Asatru could obtain firewood via family members, and was encouraged to seek assistance through other means. In summary, Mr. Watkinson has not shown that he intentionally was discriminated against in violation of the Fourteenth Amendment.

**19.** **Reasonably Related to Legitimate Penological Interests.** Further, as explained *supra*, even if Mr. Watkinson could show intentional discrimination by Defendants, they have carried their burden of showing that Alaska DOC's policies are reasonably related to the legitimate penological interest of orderly and securely administering a fund for the general welfare of all inmates.

**20.** **The Missing Witness Rule.** Mr. Watkinson argues the so-called "missing witness rule" should apply in this case because the individual Defendants did not testify at trial.[115] He asks this Court to infer from their absence: (1) "[d]uring the period

---

[113] *Turner*, 482 U.S. at 85 ("Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.").

[114] *Freeman*, 125 F.3d at 737 (alterations in original) (citing to *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987)).

[115] Docket 92 at 13–14.

in which virtual balances within the PWF were allowed, no actual security or fraud problems occurred"; (2) "the 'administrative burden' of maintaining a virtual balance in the PWF is negligible"; and (3) "Mr. Hauser [sic] would never approve any PWF funding proposal from a religious group"; but only "to the extent that the evidence already is not undisputed on these points."[116] It is entirely within the discretion of the Court to give such instruction.[117]

Mr. Watkinson does not cite to any Ninth Circuit authority governing the applicability of the uncalled-witness rule in civil trials, and other courts have remarked on the Ninth Circuit's lack of jurisprudence governing the precise contours of the rule in such situations.[118] In the criminal context, the Supreme Court has stated, "[i]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."[119] But, "[i]n order to justify the inference drawn from the failure to call a witness, the testimony of the uncalled witness must not be cumulative or inferior to the evidence already presented."[120]

21.    **Cumulative Testimony.**    Mr. Hough already testified to the administrative burden that maintaining a virtual balance in the PWF would cause. Mr. Hough also already testified that religious groups are not able to obtain funding

---

[116] *Id.*
[117] *United States v. Bautista*, 509 F.2d 675, 678 (9th Cir. 1975).
[118] *Apple Inc. v. Samsung Electronics Co.*, Ltd., No. 11-CV-01846-LHK, 2012 WL 3536797, *2 (N.D. Cal. August 13, 2012) ("The parties have not cited, and the Court has not found, any Ninth Circuit authority governing the applicability of the uncalled-witness rule in civil trials.").
[119] *See Graves v. U.S.*, 150 U.S. 118, 121 (1893).
[120] *Kean v. C.I.R.*, 469 F.2d 1183, 1187 (9th Cir. 1972).

*Watkinson v. State of Alaska, Dept. of Corrections et al*                          Case No. 3:17-cv-00236-JMK
Memorandum of Decision                                                                                    Page 25
Case 3:17-cv-00236-JMK    Document 102    Filed 12/31/20    Page 25 of 27

through the PWF.[121]  Thus, drawing the second and third inferences requested by Plaintiff would be duplicative to the evidence already produced, and would not change the Court's ultimate ruling.  The Court declines to do so.

22. **Reasonable Inference.**  Further, "a missing witness instruction is proper only if from all the circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one."[122]  The Court finds it unreasonable to infer that, during the period in which virtual balances within the PWF were allowed, no actual security or fraud problems occurred.  Plaintiff could have sought clarification on this fact from Mr. Hough during trial, but chose not to.  Plaintiff cannot now assert that the lack of testimony on this precise point provides reasonable grounds for assumption; especially when a witness with specialized knowledge of the PWF administration testified at trial.  Further, as discussed *supra*, even if the Court were to draw this inference as requested by Plaintiff, it would not alter the outcome of the Court's findings.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds and concludes that Plaintiff Watkinson has not established a violation of RLUIPA, and has not established violations of his First and Fourteenth amendment rights.

---

[121]  Docket 93 at 51.
[122]  *United States  v. Bramble*, 680 F.2d 590, 592 (9th Cir. 1982).

*Watkinson v. State of Alaska, Dept. of Corrections et al*   Case No. 3:17-cv-00236-JMK
Memorandum of Decision   Page 26
Case 3:17-cv-00236-JMK   Document 102   Filed 12/31/20   Page 26 of 27

IT IS SO ORDERED this 31st day of December, 2020, at Anchorage, Alaska.

/s/ Joshua M. Kindred
JOSHUA M. KINDRED
United States District Judge
